Thank you, Your Honor, and may it please the Court. My name is Alan Migat-Tauber, and I represent the Plaintiff Appellant, Mr. Neil Grenning. In 1996, this Court ruled in Keenan v. Hall that subjecting a prisoner to constant illumination in the absence of a legitimate penological interest violates the Eighth Amendment's protections against cruel and unusual punishment. In 2014, in an earlier iteration of this case, this Court held that to be legitimate, a penological interest must apply to the prisoner being so subjected specifically. The trial court below ignored this Court's ruling when it found the State articulated legitimate penological interests despite making no findings that those interests applied to my client specifically. Therefore, this case is on all fours with Keenan, and this Court should find that my client was harmed and is entitled to declaratory and injunctive relief. First of all, we believe that, as this Court noted in the earlier Grenning 1, that there is a legitimate question as to whether or not penological interests are even an appropriate consideration in conditions of confinement claims. The Supreme Court ruled in 2005 in Johnson v. California that it is not appropriate to consider legitimate penological interests when example demonstrates why. Everyone can agree that there is a legitimate penological interest in preventing prisoners from attempting escape, but that would not justify a prison from reenacting a scene from Stephen King's Misery or Alex Haley's Roots and removing the foot of a prisoner even if he or she had made multiple escape attempts. Quite simply, a penological interest that requires violation of the Eighth Amendment is per se illegitimate, and it is our argument that subjecting a prisoner to constant illumination at the levels utilized at the Airway Heights Correctional Center is this sort of per se violation of the Eighth Amendment. Go ahead. At trial, or in front of Judge Peterson on remand, did you introduce the cases that are cited in the appendix to your reply brief where the levels of illumination are so much lower than they are at this jail? I do not believe that pro bono trial counsel introduced that evidence, Your Honor, no. So that was not in front of Judge Peterson? I do not believe it was specifically in front of Judge Peterson, although I will note that the state's expert himself testified that an appropriate foot candle level would be between 3 and 6.5 foot candles, which is what is used in ERs and for monitoring critical care patients. At this time, at the time my client was subjected to lighting, and indeed even today, the current levels of light utilized at Airway Heights are in excess of even what the state's own expert suggested was the appropriate level of lighting. For ER monitoring, okay. And what is it exactly at head level, 7 point something? Currently, it is between 7.1 and 7.6 foot candles. At the time that my client was placed in the SMU that gave rise to this particular case, it was between 10 and 12.4 foot candles. And what do we do, of course, having had a trial and we have these factual findings, and I'd like to ask you about two of those. Let me, since we're talking about the lighting level, the court found that Rapp had, he, she credited the prison expert and saying Rapp was not, was focusing on the wrong measurements, and therefore, now we get into this battle of the experts, so from your perspective, where does that figure in, that particular finding? Well, Your Honor, I don't think you necessarily need to rely on the testimony of plaintiff's expert, Mr. Rapp, because the state's own expert testified that the appropriate level of lighting was between 3 and 6.5 foot candles, which is somewhere between 20 and 133% less than what they are currently utilizing at airway heights. If we assume that my client is not a critical care patient in the ER, which he is not, then the appropriate level of lighting, according to the state's own expert, is 3 foot candles, which is far below the 7.1 to 7.6 foot candles being utilized here. So in the battle of the experts, I think the state should be held to their own expert's testimony, at the very least, and furthermore, the state's own actions here, which they claim moot my client's case, indicate that the 10 to 12.4 foot candles was far in excess of even what the prison guards needed, because one would assume that the state did not choose to utilize an energy-saving measure that would make it impossible for them to perform their legitimate penological interests. What do we do with the district court's factual finding that Mr. Harms was a result of this, and that his headaches were coming from some other source? That was my second factual issue. It's that causation. So if you would address that. Absolutely, Your Honor. Well, I think there are two problems with that factual finding. First of all, migraines were not the only harm that my client alleged. He also alleged sleep deprivation, and there is no evidence in the record that my client has ever suffered from sleep deprivation when outside the SMU. Secondly, the logic of the district court would preclude the idea that anybody with a preexisting condition can have that preexisting condition exacerbated by the actions of a prison official. To uphold that would actually create a circuit split with a decision issued by the Eighth Circuit just two weeks ago in Washington v. Denny decided on August 13th, a published decision in which they upheld a jury trial's finding that an asthmatic placed in a cell with a smoker whose asthma was exacerbated could receive compensatory damages from the prison and its officials. This would also fly in the face. How does that, that makes total sense to me, but it doesn't answer this question. Well, we just believe it was clear error for the trial court to determine that somebody with a preexisting condition could not be harmed by conditions that exacerbate that condition. She simply said that because he, the trial court judge found as a matter of fact that because my client suffered migraine headaches the Sunday before trial, it was impossible that being subjected to the lighting levels in the SMU caused the headaches of which he was complaining. And my argument is that is simply not the case. An asthmatic may get, suffer an asthma attack because he's exposed to a smoking cellmate or because of a high pollen count in the air or because of smoke coming down from British Columbia has been happening here, giving Seattle the worst air quality in the world the last week. The fact that the smoke and the pollen can cause an asthmatic attack from an external source does not mean that housing that asthmatic with a known smoking inmate doesn't cause specific attacks at that time. So what, what is the remedy in a case, if you're correct, if you're correct, that forget, um, Mr. Rapp, we don't really need Mr. Rapp, we'll just rely on the state and the district court was too constricting in the findings, is the remedy for a new trial? What is the remedy in your view? Well, Your Honor, These are factual findings. I believe that you, that this court could make a declaratory judgment that my client's rights were violated and then remand the case back to the district court to craft an appropriate injunction to enforce that declaration, to instruct the court they would limit the amount of light in the SMU cells at AHCC to a level that does not violate the eighth amendment. And that's where those cases that we see where the other levels of light can come in handy and be useful to the trial court judge. Because if we rely on legitimate peniological interests, which the Supreme Court articulated in Turner versus Safley, the court also said that an alternative that safeguards rights at a de minimis cost to a valid interest may indicate a regulation is not reasonable. And when the experience of every other court to examine foot candles, to look at every other prison that uses constant illumination, we're talking supermax facilities and the highest levels of security, and they can get away with between a tenth of a foot candle. And at most, I was able to find 2.1 foot candles to guard some of the most dangerous prisoners in the state and federal prison systems. It seems to me that Airway Heights, which is not a supermax facility, can meet their needs, their legitimate peniological interests at similarly low levels of lighting. What do we do with the availability of sleep masks? What consequence does that have going forward? Well, Your Honor, I would argue that it has very little relevance for two reasons. One, this was not a policy change that was mandated by the state legislature or the executive through the governor. They could cease providing sleep masks tomorrow. Secondly, my client testified that sleep masks did not solve the problem that they had around him. And to provide an anecdote, I use a $12 sleep mask and I have light leaks around the other side, the underside into my eyes when I'm trying to sleep. The fact that my client has a $0.99 sleep mask tells me that his is going to be much lower. I think it was $1.24. Well, it cost the prison $0.99. They then charge my client $1.24. They're making a quarter profit on every one of them. Yes, Your Honor. And additionally, would it solve that problem if they were to supply them for free? It would be better to supply them for free because it's cheaper than paying their lawyer. That would certainly be the case, Your Honor. And we believe that, you know, as we argued in the opening brief, we do not believe it is appropriate to charge prisoners to exercise their constitutional rights. But it's not the price that makes the sleep mask unfeasible. It's the fact that it can be taken away tomorrow. There's, in fact, no guarantee that if you're taken out of your cell and taken to solitary, you'll be allowed to grab your sleep mask on the way. And the sleep mask itself, as my client testified. And it seems to me that that's a lot of ifs for the Court of Appeals to deal with, which is why I was kind of asking if we were to accept your broad proposition, whether just a general remand would be more appropriate. We would find a general remand to be acceptable, Your Honor. We think that you could give a declaratory judgment that the lighting is unconstitutionally bright and remand for the creation of an injunction. But a remand for a new trial would be acceptable to my client as well. You've also made an argument about individualizing lighting depending upon the particular prisoner and two aspects to that. You focused on the particular sensitivity of this prisoner. But there's another category of what you look at, and that is, well, why is the prisoner in there? And you've talked about that in your brief. Is the prisoner in there for suicide watch? Is the prisoner in there for violence on other prisoners? Is the prisoner in there, as Mr. Groning apparently was, he was involved in a fight. He contends he was the victim. And they're just trying to find out. They're putting him in there as they find out. How feasible is it for the prison facility, the jail, to sort these people out with respect to the second category? Like, why are they in there? And therefore, what level of illumination or do they need illumination at all? Well, it's quite feasible, Your Honor, because as the record shows, in order to subject, in order to place a prisoner in the SMU in the first place, the prison has to make, has to fill out a form, an administrative referral. And that administrative referral has specific categories, such as attack to fellow inmate, attack to guard, was discovered with contraband. All of those, in 90, I would venture to say in the vast majority of cases in which a prisoner is being referred to the SMU, the referral itself makes that individualized determination of legitimate penological interest, because that's why we're sending you to the cell, because you had contraband, because you had a weapon, because you attacked a guard or a fellow inmate. It's only in those rare instances, such as my client fell in here, where he was put in protective custody for his benefit, that you would really have to say, OK, is that a sense where maybe he shouldn't be subjected to constant illumination? Is that what the facts are here? He was put in there, but as I read the record, he was put in there because somehow he was involved in a fight. He refused to say what happened. It's often the case for prisoners, they won't say what happened when they're attacked for fear that they'll be subjected to retaliation later on. But when he was put in there, as I understand it, the prison officials only knew that he was suffering from a wound to his nose and he said, I fell against the faucet, which was a baloney story. But of course, they didn't know what the true story was. Correct. But they clearly suspected that he had been the victim of an assault and there was no evidence, there was no indication that anyone at the prison believed he had self-harmed, which would justify subjecting him to constant illumination. They either knew that he was the victim of an accident, as he had put forth, or that he was the victim of a vicious and unprovoked assault or even a provoked assault. But he was the victim of an assault and they put him there to get him away from whoever attacked him while they could determine who it was who engaged in the fight. Would you like to reserve your remaining time? I would, Your Honor. Thank you. Good morning, Your Honors, and may it please the court. Assistant Attorney General Tim Fulner on behalf of Ms. Miller-Stout and Mr. Fox. After taking testimony for three days that included courtroom demonstrations, the trial court correctly concluded that the defendants did not violate Mr. Grenning's Eighth Amendment rights. This court, given that trial court's decision, appropriate deference should affirm for two reasons. First, the district court correctly found that defendants were not deliberately indifferent to any serious risk of harm to Mr. Grenning. And second, the trial court correctly concluded the lighting in the SMU is tailored to a clearly defined safety purpose and that there was no evidence that that purpose would be served by a lower level of lighting. Because of that, how can you say that there was no evidence that that would be served by a lower level of lighting when, according to what we just heard, the state's own expert says you don't need this level of lighting? That is just an incorrect characterization of Mr. Rapp's testimony, Your Honor, which appears at ER 71. Mr. Rapp gave, or Mr. Lane, excuse me, the state's expert, Mr. Lane, gave two comparators of three to 6.5 foot candles of an average in a room that he would compare to the SMU. He was using those as comparators. It is uncontested that the SMU lighting is 5.9 foot candles average in that cell based on the measurements by Mr. Rapp, the plaintiff's expert. Now, plaintiffs at trial did not propose any standard by which the light should be lowered. If the court is accepting their test, their statement today that the standard should be Mr. Lane's standard, the SMU fits within that standard at 5.9 average foot candles. Okay. Deliberative difference is a high legal standard because it is a factual question. The factual findings that the district court made are key. The district court made two factual findings that both defendants were not aware of any risks to Mr. Grenning. That factual finding is on ER 18, and that both Mr. Fox and Ms. Miller Stout acted reasonably in light of risk, even if they were aware of that. Those findings were based on the fact that Mr. Fox, when he received Mr. Grenning's grievance, did two things. He talked to a supervisor who told him that the American Correctional Association had a medical department and asked if they'd received any complaints from Mr. Grenning. They told him they had not. Based on that, Mr. Fox's response to the grievance was not deliberate indifference, and the trial court's finding related to Mr. Fox was not clear error. What do we do with the district court's finding that Mr. Grenning's complaint of headaches and other harm was just false? He says he suffered no harm as a result of that. That strikes me as contrary to some of the evidence in the record. Well, Your Honor, there is evidence to support. I think it's based on credibility is what I think the district court ultimately is. And I think there are three important things about the credibility of Mr. Grenning's testimony. Mr. Grenning's made a couple of claims throughout this lawsuit. The first was that he could not tell light from day in the SMU. That was something that the court cited in Grenning one, and that he testified to a trial. The second was that Mr. Grenning testified that the he wrapped a towel in four layers and put it above his eyes and that the light seeped through that or pounded through the towels. I believe that phrase he used. The third thing he testified to is that the sleep mask was ineffective because the lighting set seeped through. So taking those one at a time, first of all, what Mr. Grenning had failed to mention is that there's actually windows to the outside world by which anyone can look outside and tell whether or not it's light from day. So that statement windows in the cell. Yes. Yes, Your Honor. So that's so each cell has a window to the outside. Yes, Your Honor. So the testimony that he could not distinguish night from day in January in Spokane, Washington is simply hard to believe. And I think appropriately raised against Mr. Grenning's credibility. The second testimony about the towel during trial, the district court saw a demonstration by the electrician airway Heights. That demonstration included a reading of the light meter at the stand of 29.7 foot candles on the witness stand four times the lighting level in the cell at night airway Heights currently. Then Mr. McCallum put the towel over the light and that reduced it from 29.7 foot candles to 0.9 foot candles. So the idea that Mr. Grenning against testimony that the light somehow pounded through that towel was not credible. And I think the district court's ruling reflects that Mr. McCallum then placed the sleep mask, which Mr. Grenning has a sleep mask is uncontested over that light meter. And it reduced it to 0.1 foot candles. So the idea that the light seeped through, as Mr. Grenning said, I thought he said it seeped around, but maybe that maybe the preposition doesn't make that much difference. But I thought he said around, I don't think it makes much difference, Your Honor, that well, it kind of does. I mean, seeping through means that the sleep mask is not opaque. See sleep seeps around is OK. There are edges and you can kind of see around. So in terms of whether he's telling the truth or not, that may make a big difference in terms of whether he's telling the truth that seep around made that had that big an effect. That may be so, but through and around, I think those are different words and refer to different sort of physical, physical things. That may be true, Your Honor. But I guess the other thing is that the district court had the actual sleep mask itself by which it could evaluate whether or not it was likely that Mr. Grenning, that it was ineffective based on Mr. Grenning's testimony, that it was essentially completely ineffective. And based on those credibility findings, I think the district court correctly concluded that Mr. Grenning had failed to show he had caused that the SMU lighting had caused him any harm. And I don't think the district court made a conclusion that just because he was in the SMU, he suffered headaches outside of the SMU, that it was impossible for Mr. Grenning to show causation. Actually, what she said was in her findings was that it undermined his claim of causation. This argument about causation, about it exacerbating Mr. Grenning's injuries was an argument that was made to the trial court and she rejected. So I don't think the trial court misunderstood that under the Eighth Amendment, it may be cruel, unusual punishment if something exacerbates an individual, an inmate's individualized sensitivities. So in your view, she was not saying that a preexisting condition somehow negates the possible causation? Absolutely not, Your Honor. I think, I mean, this is the exact argument that they, that they made to her at trial as I understood it. And, and so I think her finding is based on a lack of credibility of Mr. Grenning and a lack of credibility of their expert who testified to a number of things that are just contrary to common sense, including the idea that any lighting would affect Mr. Grenning's sleep, that would deprive him of sleep. So it wouldn't matter what level of lighting the SMU would be reduced to because it would interfere with his sleep. She's testified that the sleep mask would have no, no impact on the, on the level of lighting to Mr. Grenning. And she also testified using her definition of sleep deprivation, which was denial of sleep or insufficient sleep for seven to nine hours of night. That was the standard that she was applying. One night of sleep, one night of sleep where you'd not get seven to nine hours of adequate sleep. One of the arguments that counsel made is that his client is concerned that down the road, either he or others would be in this situation and the sleep mask would not be available, that it's sort of an after the fact provision, if you will, by the state. What's your answer to that? Is it now standard equipment? Where does it say that? There is, in the record, there is a memo from the secretary of the Washington Department of Corrections to all facilities talking about the availability of sleep masks to all inmates. Additionally, it's uncontested that Mr. Grenning himself has a sleep mask. So in order to accept the idea that he would be harmed down the road would be, you'd have to accept the idea that he is placed back in the SMU for some reason and that basically confiscate the sleep mask from him to conclude that he would have that unavailable while he's in the SMU. And I don't believe there's any plan for the Washington Department of Corrections to change that practice. And there's certainly no evidence in the record to suggest that there is. In terms of the objective prong of the Eighth Amendment, the trial court found that the SMU lighting was tailored to a clearly defined safety purpose and concluded based on that, that it did not inflict unnecessary and wanton pain on Mr. Grenning. It's important to know that the narrow scope of the issue that was presented to the trial court on remand. By trial, Mr. Grenning had conceded that the use of 24-hour lighting in the SMU itself served a legitimate penological interest in ensuring that prison staff could see the guards every 30 minutes during those checks. But he did, but the only thing he contested was the level of lighting in that cell. He called an expert that had never been to a prison or a jail other than the SMU. He didn't introduce any of the opinions that are being cited on appeal. None of that information was before the trial court. And she concluded correctly that based on that, there was a lack of evidence that there was any lower level of lighting that would serve the SMU purpose. Keenan did not establish that 24-hour lighting in a prison with a penological interest violates the Eighth Amendment. We know that because Chappell says that. Chappell, it's a qualified immunity case, but it says that Keenan did not establish that 24-hour lighting that serves legitimate penological interest violates the Eighth Amendment. And if you go back and look at Keenan, there was no penological interest advanced. Here, there is a clear penological interest that Mr. Grenning himself agreed with in terms of the 24-hour lighting. He simply suggested that the lighting should be lowered to some unspecified level. Finally, in terms of the standing issue, I'll just briefly address that. There were two, I think, problems with Mr. Grenning's standing at trial. First of all, he had failed to show any injury or sufficient likelihood of being harmed in the future. And that's even with the trial court's conclusion that he may be placed in the SMU again. Due to the changes in the levels of lighting, due to the provision of sleep masks, there was no evidence that Mr. Grenning would be harmed in the same way if he was placed in the SMU again. The other significant problem with standing was redressability. Mr. Grenning's expert, if you accept his expert's testimony, that any level of lighting would have caused harm to Mr. Grenning if he was placed in the SMU. The relief that they were requesting in the trial court was not, would not have given him any actual relief. In the trial court, what the scope of the injunction that they sought was that in any future confinement of Mr. Grenning in the SMU, any continuous lighting used must minimize the risk of harm of sleep deprivation to Grenning while still facilitating welfare checks. Even if you credited Dr. Grenning with providing the relief that the court did not, that relief would not have, that injunction would not provide Mr. Grenning any practical relief. Can I just clarify one thing because there's different measurements, as you know, used for the lighting that sometimes get mixed and matched. So, um, I believe you referred to 71 and, um, or maybe it was, um, your colleague between three and 6.5, um, and then you said that the 5.9 fits within the standard and the 5.9 foot candles that you're referring to, is that the current level? That's the average current level. The average current level. Yes. And that's on SCR 340 is actually a grid prepared by plaintiff's expert when he visited the SMU cell and made the comparison. And it talks about the various levels of lighting in that cell, as well as Mr. Rapp, plaintiff's expert testified at trial that the average he calculated was 5.9. And what was the average if we have that information in the past? That is to say, we've got both injunctive relief that sought and damage relief that sought. So as to the past, what was the, do we know what the average foot candle was? We don't, Your Honor. We have the readings from 2010 from the electrician at Airway Heights, but he only took two readings. So I don't think that those two were those readings. Those readings were, he took two readings with two different meters. One was 10.9 with the dimmer sleeve, and then one was 12.4 with the dimmer sleeve, but those were just at one spot on the, on the bed in the cell. Yeah. Well, that, but, and that, that's my recollection of what we knew from the first time around. But obviously in the past they were higher because it's undisputed that the, that the prison has reduced the lighting level. So when you say 5.9 average now, that's obviously lower than it was before. How high it was before. I just heard you say, let me make sure I understood your answer before. Could you just clarify that though, because the testimony at 71, which is that it's between three and six or 6.5, relates to which period? That, that testimony on 71, the three to 6.5, that's his comparator. That's not referring to the average lighting. That, that refers to just his opinion about what a comparable level of lighting. Comparable level would be in the healthcare versus whatever. Right. Okay. And just, I want to go back to the question of a window to the outside in his cell. So we have evidence in the record that his cell had a window to the out of doors. I believe in his testimony. Yes, Your Honor. As well as I think in Mr. Stockwell's testimony, I don't have a record citation, but that's my recollection. Yeah. Well, I can, I can hear otherwise from your opposing counsel if that, if he, if he disagrees. And just, just to clarify, I know you mentioned damages, but at this point, the damages claims have been dismissed. It's only a injunctive, declaratory injunctive. And he could have appealed, he could have appealed that and he chose not to. So because the district court's decision was the factual findings were not clear and this court should defer to that decision, we would ask that the court affirm. Thank you. Thank you. So my colleague across the aisle referred to page 71 of the record for his expert's testimony, about three foot candles to 6.5 foot candles in healthcare facilities and critical care facilities. I would note that on page 72, the very next sentence is I'm not an expert on whether or not they should be similar to healthcare or critical care. So the expert himself declaimed even the comparisons that he was making, but even assuming that the 5.9 general foot candles is the appropriate measure. That's still nearly twice what the, what one of the measures offered by the state's expert is, and that's for general healthcare. The 6.5 is for critical care. And again, there is no evidence in this case that my client required that level of scrutiny. And as this court held in Grenning one on remand, in order to be legitimate, a penological interest has to apply specifically to the prisoner. In this case, the trial court judge relied on testimony from defendant Miller Stout and William Stockwell that it was just general safety precautions. Those were the reasons. Ms. Miller Stout testified repetitively that the reason you were sent to the SMU did not matter. That testimony flies in the face of the burden this court placed on the state. And it was the, it was what, it was exactly what this trial court accepted, despite this court's clear command. I need to go back to something that continues to nag at me, and that's the district court's conclusion that your client has failed to prove any causation of harm to him based on the fact she just doesn't believe him. Now, let me start, and I was given three reasons by your opposing counsel as to why she could legitimately conclude that she wasn't going to believe him. And number one was that he had a window in his cell. So when he says, I couldn't tell day from night, that can't be, can't be right. Was in fact, is there in the record that there was a window to the outside in his cell? I believe that the SMU cells do contain windows. Yes, sure. Okay. Second, and he testifies that four layers of towel, the light comes through anyway. Yes, Your Honor. I think it's unclear whether or not he was saying that it crept around the towel because he also testified that he's not allowed to cover his entire face. He's only allowed to cover his eyes because if he covers his face, the prison guards knock on the door and say, hey, I need to see your face. Okay. And then the third is the light seeping either through or around the sleep mask. Yes, Your Honor. I, my client testified that the light crept around the edges of the sleep mask, not through. Thank you. Thank you very much. Thank you both for your arguments this morning. Also, particularly Mr. Mygot-Tauber for appearing as pro bono counsel on behalf of the court. I know that it's always appreciated also by the attorney general. It's easier for the briefing and for the argument. So we appreciate your contribution to the pro bono program. Also appreciate the state attorney general being here. The case of Grenning versus Maggie Miller-Stout is submitted.
judges: Hawkins, McKeown, W. Fletcher